**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION, *Plaintiffs-Appellees*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARK T. ESPER, in his official capacity as Secretary of the Defense; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Department of the Treasury, *Defendants-Appellants*. | Nos. 19-16102 <br> 19-16300 <br><br> D.C. No. 4:19-cv-00892-HSG <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed June 26, 2020

Before: Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw and Daniel P. Collins, Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge Collins

## SUMMARY[*]

### Appropriations

The panel affirmed the district court's judgment in an
action brought by the Sierra Club and the Southern Border
Communities Coalition (collectively the "Sierra Club")
challenging the Department of Defense's budgetary transfers
to fund construction of a wall on the southern border of the
United States in California, New Mexico, and Arizona.

At issue is whether Section 8005 and Section 9002 of the
Department of Defense Appropriations Act of 2019 ("Section
8005") authorized the budgetary transfers to fund
construction of the wall.

The panel held that the Sierra Club had Article III
standing to pursue its claims. Specifically, the panel held that
Sierra Club's thousands of members live near and frequently
visit areas along the U.S.-Mexico border for hiking,
birdwatching, photography, and other professional, scientific,
recreational, and aesthetic activities; and construction of a
border wall and related infrastructure will acutely injure these

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

interests because the Department of Homeland Security is proceeding with border wall construction without ensuring compliance with any federal or state environmental regulations designed to protect these interests. Additionally, the interests of Sierra Club's members in the lawsuit are germane to the organization's purpose. Similarly, the panel held that the Southern Border Communities Coalition alleged facts that support that it had standing to sue on behalf of itself and its member organizations. The panel further held that Sierra Club's injuries were fairly traceable to the Section 8005 transfers. In addition, the panel held that the injury to Sierra Club members and Southern Border Communities Coalition was likely to be redressed by a favorable judicial decision.

In companion appeal *State of California v. Trump*, Nos. 19-16299 and 19-16336, slip op. (9th Cir. June 26, 2020) (published concurrently), the panel held that Section 8005 did not authorize the transfers of funds at issue here. The panel reaffirmed this holding here.

The panel held that the Executive Branch lacked independent constitutional authority to authorize the transfer of funds. The panel noted that the Appropriations Clause of the U.S. Constitution exclusively grants the power of the purse to Congress. The panel held that the transfer of funds violated the Appropriations Clause, and, therefore, was unlawful.

The panel held that the Sierra Club was a proper party to challenge the Section 8005 transfers, and concluded that Sierra Club had both a constitutional and an *ultra vires* cause of action. First, the panel held that where plaintiffs, like Sierra Club, establish that they satisfy the requirements of

Article III standing, they may invoke separation of powers constraints, like the Appropriations Clause, to challenge agency spending in excess of its delegated authority. Because the federal defendants not only exceeded their delegated authority, but also violated an express constitutional prohibition designed to protect individual liberties, the panel held that Sierra Club had a constitutional cause of action. Second, the panel held that the Sierra Club had an equitable *ultra vires* cause of action to challenge the Department of Defense's transfer of funds. Where it is alleged that the Department of Defense has exceeded the statutory authority delegated by Section 8005, plaintiffs like Sierra Club can challenge this agency action.

The panel rejected the federal defendants' additional arguments. First, the federal defendants asserted that Sierra Club's challenge must be construed as an Administrative Procedure Act ("APA") claim, rather than as a constitutional or *ultra vivres* cause of action. The panel held that the APA is not to be construed as an exclusive remedy, and the APA does not displace all constitutional and equitable causes of action. Second, the federal defendants asserted that the zone of interests test must apply to any challenge brought by Sierra Club, and that Section 8005 prescribes the relevant zone of interests. The panel held that Sierra Club fell within the Appropriations Clause's zone of interests. The unconstitutional transfer of funds here infringed upon Sierra Club's members' liberty interests, harming their environmental, aesthetic, and recreational interests. The panel concluded that the Sierra Club had a cause of action to challenge the transfers.

Finally, the panel held that the district court did not abuse its discretion in granting Sierra Club a permanent injunction

enjoining the federal defendants from spending the funds at issue.  First, the panel agreed with the district court that Sierra Club would suffer irreparable harm to its recreational and aesthetic interests absent injunction.  Second, the panel agreed with the district court that the balance of equities and the public interest favored injunctive relief.  The panel held that the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), did not require the panel to vacate the injunction.

Judge Collins dissented.  He agreed that at least the Sierra Club established Article III standing, but in his view the organizations lacked any cause of action to challenge the transfers.  Even assuming that they had a cause of action Judge Collins would conclude that the transfers were lawful. Accordingly, he would reverse the district court's partial summary judgment for the organizations and remand for an entry of partial summary judgment in favor of the defendants.

**COUNSEL**

H. Thomas Byron III (argued), Anne Murphy, and Courtney L. Dixon, Appellate Staff; Hashim M. Mooppan and James M. Burnham, Deputy Assistant Attorneys General; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Dror Ladin (argued), Noor Zafar, Jonathan Hafetz, Hina Shamsi, and Omar C. Jadwat, American Civil Liberties Union Foundation, New York, New York; Cecillia D. Wang, American Civil Liberties Union Foundation, San Francisco, California; Mollie M. Lee and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; David Donatti and Andre I. Segura, American Civil Liberties Union Foundation of Texas, Houston, Texas; Sanjay Narayan and Gloria D. Smith, Sierra Club Environmental Law Program, Oakland, California; for Plaintiffs-Appellees.

Douglas N. Letter (argued), Todd B. Tatelman, Megan Barbero, Josephine Morse, and Kristin A. Shapiro, United States House of Representatives, Washington, D.C.; Carter G. Phillips, Virginia A. Seitz, Joseph R. Guerra, and Christopher A. Eiswerth, Sidley Austin LLP, Washington, D.C.; for Amicus Curiae United States House of Representatives.

James F. Zahradka II (argued), Brian J. Bilford, Sparsh S. Khandeshi, Heather C. Leslie, Lee I. Sherman, and Janelle M. Smith, Deputy Attorneys General; Michael P. Cayaban, Christine Chuang, and Edward H. Ochoa, Supervising Deputy Attorneys General; Robert W. Byrne, Sally Magnani, and Michael L. Newman, Senior Assistant Attorneys General;

Xavier Becerra, Attorney General; Attorney General's Office, Oakland, California; Jennie Lusk, Civil Rights Bureau Chief; Nicholas M. Sydow, Civil Appellate Chief; Tania Maestas, Chief Deputy Attorney General; Hector Balderas, Attorney General; Office of the Attorney General, Santa Fe, New Mexico; for Amici Curiae States of California and New Mexico.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C.; Lawrence J. Joseph, Washington, D.C.; for Amicus Curiae United States Representative Andy Barr.

John W. Howard, George R. Wentz Jr., Richard Seamon, and D. Colton Boyles, Davillier Law Group LLC, Sandpoint, Idaho, for Amicus Curiae State of Arizona House of Representatives Federal Relations Committee.

Richard P. Hutchison, Landmark Legal Foundation, Kansas City, Missouri; Michael J. O'Neill and Matthew C. Forys, Landmark Legal Foundation, Leesburg, Virginia; for Amici Curiae Angel Families, Sabine Durden, Don Rosenberg, Brian McAnn, Judy Zeito, Maureen Mulroney, Maureen Laquerre, Dennis Bixby, and Advocates for Victims of Illegal Alien Crimes.

Douglas A. Winthrop, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Irvin B. Nathan, Robert N. Weiner, Andrew T. Tutt, Kaitlin Konkel, and Samuel F. Callahan, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; for Amici Curiae Former Members of Congress.

Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, and Ashwin P. Phatak, Constitutional Accountability Center, Washington, D.C., for Amici Curiae Federal Courts Scholars.

Steven A. Zalesin, Adeel A. Mangi, and Amir Badat, Patterson Belknap Webb & Tyler LLP,  New York, New York, for Amici Curiae 75 Religious Organizations.

Harold Hongju Koh, Peter Gruber Rule of Law Clinic, Yale Law School, New Haven, Connecticut; Kathleen R. Hartnett, Boies Schiller Flexner LLP, San Francisco, California; Phillip Spector, Messing & Spector LLP, Baltimore, Maryland; for Amici Curiae Former United States Government Officials.

Samuel F. Daughety and Suzanne R. Schaeffer, Dentons US LLP, Washington, D.C.; Joshua O. Rees, Acting Attorney General, Tohono O'Odham Nation, Sells, Arizona; for Amicus Brief Tohono O'Odham Nation.

# OPINION

THOMAS, Chief Judge:

We consider in this appeal challenges by the Sierra Club and the Southern Border Communities Coalition ("SBCC")[1] to the Department of Defense's budgetary transfers to fund construction of the wall on the southern border of the United States in California, New Mexico, and Arizona. Specifically, we consider whether Section 8005 and Section 9002 of the Department of Defense Appropriations Act of 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) ("Section 8005")[2] authorized the budgetary transfers. In a companion appeal, *State of California, et al. v. Trump et al.*, Nos. 19-16299 and 19-16336, we considered similar challenges filed by a collective group of States. However, because Sierra Club asserts different legal theories, and this case, when presented, was in a different procedural posture, we treat this appeal separately. We conclude that the transfers were not authorized, and that plaintiffs have a cause of action. We affirm the judgment of the district court.

---

[1] We refer throughout this opinion to Sierra Club and SBCC together as "Sierra Club," unless otherwise noted.

[2] For simplicity, because the transfer authorities are both subject to Section 8005's substantive requirements, this opinion refers to these authorities collectively as Section 8005, as did the district court and the motions panel. Our holding in this case therefore extends to both the transfer of funds pursuant to Section 8005 and Section 9002.

I

We recounted the essential underlying facts in the companion case. However, we briefly outline them here for convenience of reference.

The President has long supported the construction of a border wall on the southern border between the United States and Mexico. Since the President took office in 2017, however, Congress has repeatedly declined to provide the amount of funding requested by the President.

The debate over border wall funding came to a head in December of 2018. During negotiations to pass an appropriations bill for the remainder of the fiscal year, the President announced that he would not sign any legislation that did not allocate substantial funds to border wall construction. On January 6, 2019, the White House requested $5.7 billion to fund the construction of approximately 234 miles of new physical barrier.[3] Budget negotiations concerning border wall funding reached an impasse, triggering the longest partial government shutdown in United States history.

After 35 days, the government shutdown ended without an agreement to provide increased border wall funding in the amount requested by the President. On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"), which included the Department of Homeland Security Appropriations Act for Fiscal Year 2019, Pub. L.

---

[3] Some form of a physical barrier already exists at the site of some of the construction projects. In those places, construction would reinforce or rebuild the existing portions.

No. 116-6, div. A, 133 Stat. 13 (2019). The CAA appropriated only $1.375 billion for border wall construction, specifying that the funding was for "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector." *Id.* § 230(a)(1). The President signed the CAA into law the following day.

The President concurrently issued a proclamation under the National Emergencies Act, 50 U.S.C. §§ 1601–1651, "declar[ing] that a national emergency exists at the southern border of the United States." Proclamation No. 9,844, 84 Fed. Reg. 4949 (Feb. 15, 2019).[4] An accompanying White House Fact Sheet explained that the President was "using his legal authority to take Executive action to secure additional resources" to build a border wall, and it specified that "the Administration [had] so far identified up to $8.1 billion that [would] be available to build the border wall once a national emergency [was] declared and additional funds [were] reprogrammed." The Fact Sheet identified several funding sources, including $2.5 billion of Department of Defense ("DoD") funds that could be transferred to provide support for counterdrug activities of other federal government agencies under 10 U.S.C. § 284 ("Section 284").[5] Executive

---

[4] Subsequently, Congress adopted two joint resolutions terminating the President's emergency declaration pursuant to its authority under 50 U.S.C. § 1622(a)(1). The President vetoed each resolution, and Congress failed to override these vetoes.

[5] Section 284 authorizes the Secretary of Defense to "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if it receives a request from "the official who has responsibility for the counterdrug activities." 10 U.S.C. §§ 284(a), 284(a)(1)(A). The statute permits, among other things, support for "[c]onstruction of roads and fences and installation of lighting to block

Branch agencies began using the funds identified by the Fact Sheet to fund border wall construction. On February 25, the Department of Homeland Security ("DHS") submitted to DoD a request for Section 284 assistance to block drug smuggling corridors. In particular, it requested that DoD fund "approximately 218 miles" of wall using this authority, comprised of numerous projects. On March 25, Acting Secretary of Defense Patrick Shanahan approved three border wall construction projects: Yuma Sector Projects 1 and 2 in Arizona and El Paso Sector Project 1 in New Mexico. On May 9, Shanahan approved four more border wall construction projects: El Centro Sector Project 1 in California and Tucson Sector Projects 1–3 in Arizona.

At the time Shanahan authorized Section 284 support for these border wall construction projects, the counter-narcotics support account contained only $238,306,000 in unobligated funds, or less than one tenth of the $2.5 billion needed to complete those projects. To provide the support requested, Shanahan invoked the budgetary transfer authority found in Section 8005 of the 2019 DoD Appropriations Act to transfer funds from other DoD appropriations accounts into the Section 284 Drug Interdiction and Counter-Drug Activities-Defense appropriations account.

For the first set of projects, Shanahan transferred $1 billion from Army personnel funds. For the second set of projects, Shanahan transferred $1.5 billion from "various excess appropriations," which contained funds originally

---

drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). DoD's provision of support for other agencies pursuant to Section 284 does not require the declaration of a national emergency.

appropriated for purposes such as modification of in-service missiles and support for U.S. allies in Afghanistan.

As authority for the transfers, DoD invoked Section 8005, which provides, in relevant part that:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred.[6]

Section 8005 also explicitly limits when its authority can be invoked: "*Provided*, That such authority to transfer may

---

[6] The other authority invoked by the Federal Defendants, Section 9002 provides that: "Upon the determination of the Secretary of Defense that such action is necessary in the national interest, the Secretary may, with the approval of the Office of Management and Budget, transfer up to $2,000,000,000 between the appropriations or funds made available to the Department of Defense in this title: *Provided*, That the Secretary shall notify the Congress promptly of each transfer made pursuant to the authority in this section: *Provided further*, That the authority provided in this section is in addition to any other transfer authority available to the Department of Defense and is subject to the same terms and conditions as the authority provided in section 8005 of this Act."

not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."

Although Section 8005 does not require formal congressional approval of transfers, historically DoD had adhered to a "gentleman's agreement," by which it sought approval from the relevant congressional committees before transferring the funds. DoD deviated from this practice here—it did not request congressional approval before authorizing the transfer. Further, the House Committee on Armed Services and the House Committee on Appropriations both wrote letters to DoD formally disapproving of the reprogramming action after the fact. Moreover, with respect to the second transfer, Shanahan expressly directed that the transfer of funds was to occur "without regard to comity-based policies that require prior approval from congressional committees."

In the end, Section 8005 was invoked to transfer $2.5 billion of DoD funds appropriated for other purposes to fund border wall construction.

II

On February 19, 2019, Sierra Club filed a lawsuit challenging the Executive Branch's funding of the border wall.[7] Sierra Club pled theories of violation of the 2019

---

[7] California, New Mexico, and fourteen other states had filed a lawsuit the previous day challenging the same border wall funding. Both lawsuits named as defendants Donald J. Trump, President of the United States, Patrick M. Shanahan, former Acting Secretary of Defense, Kirstjen

CAA, violation of the constitutional separation of powers, violation of the Appropriations Clause, violation of the Presentment Clause, violation of the National Environmental Policy Act ("NEPA"), and *ultra vires* action.

Sierra Club subsequently filed a motion requesting a preliminary injunction to enjoin the transfer of funds pursuant to Section 8005 to construct a border wall in Arizona's Yuma Sector and New Mexico's El Paso Sector. The district court held that Sierra Club had standing to assert its Section 8005 claims, and granted the preliminary injunction motion. The Federal Defendants timely appealed the preliminary injunction order. Sierra Club subsequently sought a supplemental preliminary injunction to block additional construction planned in California's El Centro Sector and Arizona's Tucson Sector.

Sierra Club also filed a motion requesting partial summary judgment, a declaratory judgment, and a permanent injunction to enjoin the transfer of funds pursuant to Section 8005 to construct a border wall in Arizona's Yuma and Tucson Sectors, California's El Centro Sector, and New Mexico's El Paso Sector. The Federal Defendants cross-moved for summary judgment and opposed Sierra Club's motion. The district court granted Sierra Club's motion for partial summary judgment and granted its request for a declaratory judgment and a permanent injunction. The Federal Defendants requested that the district court certify the judgment for appeal under Fed. R. Civ. P. 54(b). The district

---

M. Nielsen, former Secretary of Homeland Security, and Steven Mnuchin, Acting Secretary of the Treasury in their official capacities, along with numerous other Executive Branch officials (collectively referenced as "the Federal Defendants").

court considered the appropriate factors, made appropriate findings, and certified the order as final pursuant to Rule 54(b). *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574–75 (9th Cir. 2018) (explaining when certification is appropriate under Rule 54). The Federal Defendants timely appealed the district court decision.

The Federal Defendants initially filed a motion to stay the district court's preliminary injunction, and in their later briefing on summary judgment, they requested that the district court stay any permanent injunction granted pending appeal. The district court denied both requests. The Federal Defendants filed an emergency motion for stay of the preliminary injunction pending appeal in this Court and subsequently sought a stay of the permanent injunction, relying on the same arguments. *Sierra Club v. Trump*, 929 F.3d 670, 685 (9th Cir. 2019). An emergency motions panel of this Court considered whether to stay the injunction pending appeal, and held that a stay was not warranted. *Id.* at 677. The Federal Defendants then filed an application for a stay pending appeal with the Supreme Court. The Supreme Court granted the application, noting that "[a]mong the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.).

We now consider the merits of the Federal Defendants' appeal of the district court's grant of partial summary judgment, grant of a declaratory judgment, and grant of a

permanent injunction to Sierra Club.**[8]** We review the existence of Article III standing *de novo*. *See California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 420 (9th Cir. 2019). We review questions of statutory interpretation *de novo*. *See United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017).

### III

Sierra Club has Article III standing to pursue its claims. To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).**[9]** An organization has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right," and when "the interests it seeks to protect are germane to the organization's purpose." *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert.*

---

**[8]** We dismiss the Federal Defendants' appeal of the district court's grant of the preliminary injunction as moot. *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) ("The district court's entry of final judgment and a permanent injunction moots Arizona's appeal of the preliminary injunction."); *see also Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 949–50 (9th Cir. 1983); *SEC v. Mount Vernon Mem'l Park*, 664 F.2d 1358, 1361–62 (9th Cir. 1982).

**[9]** The Federal Defendants do not challenge Sierra Club's Article III standing in these appeals. However, "the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

*Comm'n*, 434 U.S. 333, 343 (1977)).[10]  An organization has standing to sue on its own behalf when it suffers "both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).  It must "show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*  At summary judgment, a plaintiff cannot rest on mere allegations, but "must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 412 (2013) (quotations and citation omitted). However, these specific facts "for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561.

Here, Sierra Club and SBCC have alleged facts that support their standing to sue on behalf of their members. Sierra Club has alleged that the actions of the Federal Defendants will cause particularized and concrete injuries to its members, and SBCC has shown that it has suffered a concrete injury itself.

Sierra Club has more than 400,000 members in California, over 9,700 of whom belong to its San Diego Chapter.  Sierra Club's Grand Canyon Chapter, which covers

---

[10] *United Food and Commercial Workers* held that those two requirements were based on constitutional demands, but held that the third prong of *Hunt*'s test for organizational standing, whether the claim or relief requested requires the participation of individual members in the lawsuit, was prudential only. *Id.* at 555.  In any case, because the claim and relief requested here do not require the participation of Sierra Club or SBCC members, even this prudential consideration supports plaintiffs' standing here.

the State of Arizona, has more than 16,000 members. Sierra Club's Rio Grande Chapter includes over 10,000 members in New Mexico and West Texas. These members visit border areas such as the Tijuana Estuary (California), the Otay Mountain Wilderness (California), the Jacumba Wilderness Area (California), the Sonoran Desert (Arizona), Cabeza Prieta National Wildlife Refuge (Arizona), and the Chihuahan Desert (New Mexico).

Sierra Club's thousands of members live near and frequently visit these areas along the U.S.-Mexico border for hiking, birdwatching, photography, and other professional, scientific, recreational, and aesthetic activities. They obtain recreational, professional, scientific, educational, and aesthetic benefits from their activities in these areas, and from the wildlife dependent upon the habitat in these areas. The construction of a border wall and related infrastructure will acutely injure these interests because DHS is proceeding with border wall construction without ensuring compliance with any federal or state environmental regulations designed to protect these interests.

Sierra Club has adequately set forth facts and other evidence by declaration, which taken as true, support these allegations for the purpose of Article III standing.

Sierra Club members Orson Bevins and Albert Del Val have alleged that they will be injured by construction of Yuma Project 1. Bevins avers that he visits the area several times per year and is concerned that the wall "would disrupt the desert views and inhibit [him] from fully appreciating [the] area," and that the additional presence of U.S. Customs and Border Protection agents "would further diminish[] [his] enjoyment of these areas" and "deter[] [him] from further

exploring certain areas." Del Val worries that "construction and maintenance of the border wall will limit or entirely cut off [his] access to [] fishing spots" along the border, where he has fished for more than 50 years.

Sierra Club member Elizabeth Walsh has alleged that construction of El Paso Sector Project 1 would injure her because "[a]s part of [her] professional and academic work [she] routinely visit[s] and stud[ies]" the area where the project would be built to "supervise several ongoing and long-term biology studies in this area with graduate students on the aquatic diversity of ephemeral wetlands known locally as playas." Among other things, she is worried that border wall construction would "negatively impact the scientific playa studies . . . because a wall could impede vital natural drainage patterns for the playas."

Sierra Club member Carmina Ramirez has alleged that she "will be harmed culturally and aesthetically" if El Centro Sector Project 1 is built because she has spent her entire life in the area surrounding the U.S.-Mexico Border, including the El Centro Sector, and she believes that border wall construction would "drastically impact [her] ability to enjoy the local natural environment," because she would "see a high border wall instead of [the] beautiful landscape," and "drastically impact [her] cultural identity by fragmenting [her] community." Construction will make her "less likely to hike Mount Signal and enjoy outdoor recreational activities; and when [she does] undertake those activities, [her] enjoyment of them will be irreparably diminished."

Sierra Club member Ralph Hudson "recreat[es] in the wilderness areas along the U.S.-Mexico border" in the area referred to as the Tucson Sector and has done so for 20 years.

He uses the land "to hike, take photos, and explore the natural history." He is "extremely concerned that Tucson Projects 1 and 2 will greatly detract from [his] ability to enjoy hiking, camping, and photographing these landscapes."

Sierra Club member Margaret Case lives a few miles from the border, and she asserts that she will be injured by the construction of Tucson Sector Project 3. "With each increase and escalation in enforcement along the border, [her] and other border residents' quality of life decreases" and "[t]he proposed wall . . . extend an already unwanted eyesore in the middle of a landscape whose beauty [she] treasure[s], irrevocably harming [her] enjoyment of that landscape."

Additionally, the interests of Sierra Club's members in this lawsuit are germane to the organization's purpose. Sierra Club is a national organization "dedicated to exploring, enjoying, and protecting the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives." Sierra Club's organizational purpose is at the heart of this lawsuit, and it easily satisfies this secondary requirement.

SBCC has also alleged facts that support that it has standing to sue on behalf of itself and its member organizations. SBCC alleged that since the Federal Defendants proposed border wall construction, it has had to "mobilize[] its staff and its affiliates to monitor and respond to the diversion of funds and the construction caused by and accompanying the national emergency declaration." These "activities have consumed the majority of SBCC staff's time, thereby interfering with SBCC's core advocacy regarding border militarization, Border Patrol law-enforcement

activities, and immigration reform," but it has had no choice because it "must take these actions in furtherance of its mission to protect and improve the quality of life in border communities."

SBCC Director Vicki Gaubeca confirms these allegations. She has stated that a "border wall, as a physical structure and symbol, is contrary to the goals of SBCC and the needs of border communities." She avers that the "emergency declaration and the threat and reality of construction have caused [SBCC] to reduce the time [it] spend[s] on [its] core projects, including public education about border policies, community engagement on local issues, and affirmative advocacy for Border Patrol accountability and immigration reform." SBCC and its member organizations have instead "been forced to devote substantial time to analyze and respond to the declaration and the promise to build border walls across the southern border" "at a substantial monetary and opportunity cost."

These allegations are sufficient to establish that, if funds are transferred to the border wall construction projects, Sierra Club members and SBCC will each suffer injuries in fact.

Sierra Club and SBCC have also shown that such injuries are "fairly traceable to the challenged action of the [Federal Defendants], and [are] not the result of the independent action of some third party not before the court." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). It makes no difference that the border wall construction is the product of other statutory provisions, such as Section 284, in addition to Section 8005. "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the

plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *Id.* The Federal Defendants could not build the border wall projects challenged by Sierra Club without invoking Section 8005's transfer authority—without this authority, there was no money to build these portions of the border wall; therefore, construction is fairly traceable to the Section 8005 transfers.

The injury to Sierra Club members and SBCC is likely to be redressed by a favorable judicial decision. A judicial order prohibiting the Federal Defendants from spending the money transferred pursuant to Section 8005 would stop construction, thereby preventing the harm alleged by Plaintiffs. Thus, Sierra Club and SBCC have established that their members satisfy the demands of Article III standing to challenge the Federal Defendants' actions.

IV

First, we consider whether Section 8005 or any constitutional provision authorized DoD to transfer the funds at issue. We hold they did not.

A

Section 8005 provides DoD with limited authority to transfer funds between different appropriations accounts, but it provides no such authority "unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." In the opinion filed today in the companion case, *State of California, et al. v. Trump, et al.*, Nos. 19-16299 and

19-16336, slip op. at 37 (9th Cir. filed June 26, 2020), we hold that Section 8005 did not authorize the transfer of funds at issue here because "the border wall was not an unforeseen military requirement," and "funding for the wall had been denied by Congress."  We reaffirm this holding here and conclude that Section 8005 did not authorize the transfer of funds.

B

The "straightforward and explicit command" of the Appropriations Clause[11] "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quotation and citation omitted).  The Clause is "a bulwark of the Constitution's separation of powers."  *U.S. Dep't. Of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012); *see also United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016).  It "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents."  *Office of Pers. Mgmt.*, 496 U.S. at 427–28.  Without it, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure."  *Id*. at 427 (quoting Joseph Story, 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)).

Accordingly, "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the

---

[11] "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."  U.S. Const. art. I, § 9, cl. 7.

President." *City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7). "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *Id.* at 1233–34 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

Here, the Executive Branch lacked independent constitutional authority to authorize the transfer of funds. These funds were appropriated for other purposes, and the transfer amounted to "drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *McIntosh*, 833 F.3d at 1175.

Therefore, the transfer of funds here was unlawful.

V

All that is left for us to decide, then, is whether Sierra Club is a proper party to challenge the Section 8005 transfers. Sierra Club asserts that it has a number of viable causes of action—including a constitutional cause of action and an *ultra vires* cause of action—while the Federal Defendants assert that Sierra Club has none.

The Supreme Court stay order suggests that Sierra Club may not be a proper challenger here. *See Sierra Club*, 140 S. Ct. at 1. We heed the words of the Court, and carefully analyze Sierra Club's arguments. Having done so, we conclude that Sierra Club has both a constitutional and an *ultra vires* cause of action.

In reaching this result, we realize that this is a rare case in which the "judiciary may . . . have to intervene in determining

where the authority lies as between the democratic forces in our scheme of government." *Youngstown*, 343 U.S. at 597 (1952) (Frankfurter, J. concurring). In doing so, we remain "wary and humble," *id.*, for "[i]t is not a pleasant judicial duty to find that the President has exceeded his powers," *id.* at 614. But where, as here, "Congress could not more clearly and emphatically have withheld [the] authority," *id.* at 602, exercised by DoD, "with full consciousness of what it was doing and in the light of much recent history," *id.*, and Sierra Club satisfies the rigors of Article III standing, our "obligation to hear and decide [this] case is virtually unflagging," *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quotations and citation omitted). "All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821).

## A

First, we consider whether Sierra Club has a constitutional cause of action to challenge the Federal Defendants' transfer. We hold that it does.

Certain provisions of the Constitution give rise to equitable causes of action. Such causes of action are most plainly available with respect to provisions conferring individual rights, such as the Establishment Clause or the Free Exercise Clause. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018); *Flast v. Cohen*, 392 U.S. 83 (1968). But certain structural provisions give rise to causes of action as well. *See Nat. Labor Relations. Bd. v. Noel Canning*, 573 U.S. 513, 556–57 (2014) (cause of action based on the Recess Appointments Clause); *Bond v. United States*, 564 U.S. 211, 225–26 (2011) (cause of action based on structural principles

of federalism); *Clinton v. City of New York*, 524 U.S. 417, 434–36 (1998) (cause of action based on the Presentment Clause); *INS v. Chadha*, 462 U.S. 919, 943–44 (1983) (cause of action based on the constitutional requirement of bicameralism and presentment); *McIntosh*, 833 F.3d at 1174–75 (cause of action based on the Appropriations Clause).

In *Bond*, the Supreme Court articulated why certain structural constitutional provisions give rise to causes of action. The Court considered "whether a person indicted for violating a federal statute has standing to challenge its validity on the grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States." 564 U.S. at 214. The Court held that "[j]ust as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism." *Id.* at 223–24. It reasoned that the challenge was permissible because "structural principles secured by the separation of powers protect the individual as well," and "[a]n individual has a direct interest in objecting to laws that upset the constitutional balance . . . when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Id.* at 222. In other words, an individual who otherwise meets the requirements of Article III standing may challenge government action that violates structural constitutional provisions intended to protect individual liberties.

We have held that the Appropriations Clause contains such a cause of action. *See McIntosh*, 833 F.3d at 1173–74. In *McIntosh*, defendants moved to enjoin their prosecutions

for federal marijuana offenses on the grounds that a congressional appropriations rider prohibited the Department of Justice from spending federal funds on such prosecutions. *Id.* at 1168.  We held that "[the Appropriations Clause] constitutes a separation-of-powers limitation that Appellants can invoke to challenge their prosecutions." *Id.* at 1175.  The opinion reasoned that so long as a litigant satisfies the Article III standing requirements, he or she can challenge Appropriations Clause violations because "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for . . . the courts to enforce them when enforcement is sought." *Id.* at 1172 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)).  In *McIntosh*, we also reaffirmed the Supreme Court's statement in *Bond* that "both federalism and separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints '[w]hen government acts in excess of its lawful powers.'" *Id.* at 1174 (quoting *Bond*, 564 U.S. at 222).[12]

The cause of action available to the plaintiffs in *McIntosh* is available to Sierra Club here.  Congress decided the order of priorities for border security.  In doing so, it chose to allocate $1.375 billion to fund the construction of pedestrian

---

[12] The Federal Defendants incorrectly characterize *McIntosh*'s constitutional holding as dicta.  The *McIntosh* Court discussed the availability of a constitutional cause of action, analogizing to *Bond* and *Canning*, and stating that "Appellants have standing to invoke separation-of-powers provisions of the Constitution to challenge their criminal convictions." 833 F.3d at 1174.  Because the Court "confront[ed] an issue germane to the eventual resolution of the case," and "resolve[d] it after reasoned consideration in a published opinion," *McIntosh*'s constitutional holding is "the law of the circuit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (quotations and citation omitted).

fencing in Texas. *See* 2019 CAA § 230(a)(1). It declined to provide additional funding for projects in other areas, and it declined to provide the full $5.7 billion sought by the President: it is for the courts to enforce Congress's priorities, and we do so here. Where plaintiffs, like Sierra Club, establish that they satisfy the requirements of Article III standing, they may invoke separation-of-powers constraints, like the Appropriations Clause, to challenge agency spending in excess of its delegated authority.

The Federal Defendants argue that *Dalton v. Specter*, 511 U.S. 462 (1994) forecloses this result. They assert that *Dalton*'s proposition that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," means that when there is a claim that an Executive Branch official acted in excess of his statutory authority, there is no constitutional violation. *Id.* at 472. But *Dalton* does not hold that *every* action in excess of statutory authority is *not* a constitutional violation.[13] Rather, *Dalton* suggests that some

---

[13] Notably, the plaintiffs in *Dalton* never alleged that the President violated the Constitution and sought review "exclusively under the [Administrative Procedure Act ("APA")]." *Id.* at 471. Only the Court of Appeals "sought to determine whether non-APA review, based on either common law or constitutional principles, was available." *Id.* The Supreme Court did not consider whether the President had violated a specific constitutional prohibition; instead, it took issue only with the Court of Appeals' contention that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* The Supreme Court's objection to this conclusion is unsurprising in the context of the Defense Base Closure and Realignment Act of 1990 at issue in *Dalton*. The Constitution divides authority with respect to the military between Congress and the President. Here, in contrast, the Constitution delegates exclusively to Congress the power of the purse.

actions in excess of statutory authority may be constitutional violations, while others may not. Specifically, *Dalton* suggests that a constitutional violation may occur when an officer violates an express prohibition of the Constitution. *Id.* (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396–97 (1971) for the distinction between "actions contrary to [a] constitutional prohibition," and those "merely said to be in excess of the authority delegated . . . by the Congress"). The Appropriations Clause contains such a constitutional prohibition, declaring that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art.1, § 9, cl. 7. Under *Dalton*, then, violations of the Appropriations Clause may give rise to viable causes of action.

*Dalton*'s discussion of *Youngstown* only underscores this point. The Court determined that *Youngstown* could not stand for the proposition "that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution" because in *Youngstown* "no statutory authority was claimed." *Dalton*, 511 U.S. at 473 (emphasis added). The Court concluded only that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* Thus, *Dalton* and its discussion of *Youngstown* do not address situations in which the President exceeds his or her statutory authority, and in doing so, *also* violates a specific constitutional prohibition, as is the case here.

Neither does *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), require an opposite result here. In *Armstrong*, the Supreme Court rejected the argument that the Supremacy Clause created a private right of action. *Id.* at 325–27. But the Supremacy Clause is not the

Appropriations Clause: while the Supremacy Clause "only declares a truth, which flows immediately and necessarily from the institution of a Federal Government," *id.* at 325 (citing The Federalist No. 33, p. 207 (J. Cooke ed. 1961)), the Appropriations Clause contains an explicit prohibition, which protects individual liberty, because "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury," *McIntosh*, 833 F.3d at 1175. "The individual loses liberty in a real sense if [the appropriations power] is not subject to traditional constitutional constraints." *Clinton v. City of New York*, 524 U.S. at 451 (Kennedy, J., concurring). Thus, while it might be "strange" "to give a clause that makes federal law supreme a reading that *limits* Congress's power to enforce that law," *Armstrong*, 575 U.S. at 326, it is entirely sensible to give a clause that restricts the power of the federal government as a whole a reading that safeguards individual liberty.

Therefore, because the Federal Defendants not only exceeded their delegated authority, but also violated an express constitutional prohibition designed to protect individual liberties, we hold that Sierra Club has a constitutional cause of action here.

B

Second, we consider whether Sierra Club has an equitable *ultra vires* cause of action to challenge the Federal Defendants' transfer. We hold that it does.

Whether Sierra Club can assert an equitable *ultra vires* cause of action turns on "whether the relief [it] request[s] . . .

was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a "judge-made remedy" for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review. *Armstrong*, 575 U.S. at 327. "The substantive prerequisites for obtaining an equitable remedy . . . depend on traditional principles of equity jurisdiction." *Grupo Mexicano*, 527 U.S. at 318–19 (quotations and citation omitted).

The relief Sierra Club requests has been traditionally available. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327 (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)); *see also Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."). Such causes of action have been traditionally available in American courts: "[w]hen Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced." *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988).

The passage of the APA has not altered this presumption. "Prior to the APA's enactment . . . courts had recognized the right of judicial review of agency actions that exceeded

authority," and "[n]othing in the subsequent enactment of the APA altered [that] doctrine of review," to "repeal the review of *ultra vires* actions." *Id.* at 224. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.*

That Sierra Club has a cause of action to enjoin the unconstitutional actions at issue here is best illustrated by *Youngstown*. There, Congress passed numerous statutes authorizing the President to take personal and real property under specific conditions. 343 U.S. at 585–86. During the Korean War, however, President Truman signed an executive order seizing most of the nation's steel mills, even though the conditions of the statutes had not been satisfied as a matter of fact. *Id.* at 582, 586. It fell to the Supreme Court to determine whether the President had constitutional authority to seize the steel mills—it held he did not and affirmed the district court injunction. *Id.* at 588–589. The Court never questioned that it had the authority to provide the requested relief.

Such is the case here. Section 8005 authorizes DoD to transfer funds under certain conditions; however, as explained previously, DoD failed to satisfy those conditions. Likewise, as explained previously, the Executive Branch lacks independent constitutional authority to fund border wall construction. If an equitable *ultra vires* action was available to the plaintiffs in *Youngstown*, it surely must be available to Sierra Club here.

A number of D.C. Circuit cases reaffirm that review is ordinarily available when an agency exceeds its delegation of authority. In *Chamber of Commerce of the United States v. Reich*, the D.C. Circuit considered whether the Chamber of

Commerce had a cause of action to challenge an executive order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike. 74 F.3d 1322, 1325–26 (D.C. Cir. 1996). The government argued that the Chamber of Commerce lacked a statutory cause of action and that APA review was not available because the challenge was directed at the President's statutory authority to issue the executive order, and the President is not an agency within the meaning of the APA. *See id.* The court agreed that APA review was not available, but it held that non-statutory review remained available. *See id.* at 1327. The court held that "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Id.* The court reasoned in part that "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id.* (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944)).

Likewise, in *Dart v. United States*, the D.C. Circuit considered whether the plaintiff could challenge the Secretary of Commerce's decision to impose civil sanctions for a violation of the Export Administration Act ("EAA"). *See* 848 F.2d at 219. The court held that even though the EAA expressly limited judicial review, the court retained the ability to review whether the Secretary exceeded the authority delegated by the statute. *See id.* at 223–34. It explained that "the presumption of judicial review is particularly strong where an agency is alleged to have acted beyond its authority." *Id.* at 223. It ultimately concluded that the Secretary had done just that and invalidated the sanctions he imposed.

These cases support our holding here that Sierra Club has an equitable *ultra vires* cause of action to challenge DoD's transfer of funds. Where it is alleged that DoD has exceeded the statutory authority delegated by Section 8005, plaintiffs like Sierra Club can challenge this agency action.

The Federal Defendants contend that an equitable cause of action is not available to Sierra Club here because equitable remedies are available only when they have been "traditionally available in the *specific circumstances presented*," and that the remedies sought here have not been traditionally available in the specific circumstances presented by this case.

The Federal Defendants cite *Grupo Mexicano* in support of this argument, but that case provides little support for their position. In *Grupo Mexicano*, the Court considered whether a district court had the power to issue a preliminary injunction to prevent the transfer of assets in which no lien or equitable interest was claimed. *See* 527 U.S. at 318. The Court concluded it did not. *See id.* at 333. It held that a district court cannot grant relief that "has never been available before—and especially (as here) a type of relief that has been specifically disclaimed by longstanding judicial precedent," particularly when "there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others." *Id.* at 322; *see id.* at 333.

Here, however, the plaintiffs request a type of relief that is consistent with our longstanding precedent. Indeed, as explained above, the Supreme Court has actually granted injunctive relief in circumstances very similar to these. *See, e.g.*, *Youngstown*, 343 U.S. at 589. Further, unlike attempts

to avoid paying debts, instances of Executive Branch *ultra vires* action are, fortunately, relatively rare, and unlikely to occur in contexts likely to repeat themselves precisely. Thus, the justifications for limiting equitable relief in *Grupo Mexicano* are not present here, and courts are able to grant the relief sought by Sierra Club.

We therefore hold that Sierra Club may assert an equitable *ultra vires* cause of action to challenge DoD's transfer of funds.

C

The Federal Defendants raise a number of additional arguments. We address them here.

First, the Federal Defendants assert that Sierra Club's challenge must be construed as an APA claim, rather than as a constitutional or *ultra vires* cause of action. But neither of the two cases cited by the Federal Defendants compel this conclusion. The Federal Defendants cite *Hoefler v. Babbitt*, 139 F.3d 726, 728 (9th Cir. 1998) for the proposition that "[t]he APA is the sole means for challenging the legality of federal agency action," but there, we did not consider whether plaintiffs had a constitutional or *ultra vires* cause of action; rather, we considered whether the action was properly considered under the APA or the Quiet Title Act. *See id.* at 728–29. We ultimately held that the former was appropriate. *See id.* at 729. To extrapolate from a general statement made in this context, as the Federal Defendants do here, goes too far.

Likewise, in *Bennett v. Spear*, 520 U.S. 154, 175 (1997), the Court did not consider whether plaintiffs had a

constitutional cause of action; rather, the Court considered whether the citizen-suit provision of the Endangered Species Act ("ESA") provided an exclusive statutory remedy, or whether a cause of action was also available under the APA. The Court ultimately determined that "[n]othing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so." *Id.* If anything, this case underscores that the APA is not to be construed as an exclusive remedy. Thus, the APA does not displace all constitutional and equitable causes of action.

Second, the Federal Defendants assert that the zone of interests test must apply to any challenge brought by Sierra Club, and that Section 8005 prescribes the relevant zone of interests. We reject this argument.

The zone of interests test limits which plaintiffs can invoke statutorily created causes of action. Although earlier cases, such as *Association of Data Processing Services Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), suggested that the test applied to constitutional causes of action, the Supreme Court's most recent zone of interests case, *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), clarifies that the test applies only to statutory causes of action and causes of action under the APA. *See id.* at 129 ("[T]he modern 'zone of interests' formulation originated . . . as a limitation on the cause of action for judicial review conferred by the [APA]," but "[w]e have since made clear, however, that it applies to *all statutorily created causes of action*." (emphasis added)).

Common sense supports this approach. As Judge Bork explained in *Haitian Refugee Center v. Gracey*,

Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*. Otherwise, a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue *since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest.* For example, were a case like *Youngstown*, to arise today, the steel mill owners would not be required to show that their interests fell within the zone of interests of the President's war powers in order to establish their standing to challenge the seizure of their mills as beyond the scope of those powers.

809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (emphasis added). We agree with Judge Bork.[14]  It would make little sense to

---

[14] While the dissent asserts that we rely on the wrong portion of Judge Bork's opinion, we disagree.  Section 8005 cannot merely be read as a statutory provision limiting the authority conferred when it is simultaneously a statutory power invoked by the President.  In any case, as explained below, the relevant limitation here is not the inapplicable statutory power invoked by the Executive—Section 8005—but instead the restriction on unlawful action—the Appropriations Clause. *See also Ctr. for Biodiversity v. Trump*, No. 1:19-cv-00408, 2020 WL 1643657 at \*25 (D.D.C. Apr. 2, 2020) (quoting the same language from *Haitian Refugee Center* and holding that plaintiffs "thus need not satisfy the zone of interests test for their *ultra vires* claims.").

require Sierra Club to demonstrate that it falls within the zone of interests of Section 8005. Congress may not have contemplated the environmental advocacy group when it included Section 8005 in the defense budget, but nevertheless, Sierra Club has asserted a legally cognizable injury. The fact Congress did not have Sierra Club as a particular plaintiff in mind when it authorized Section 8005's transfer authority does not make its injury less real, nor DoD's action more lawful.

If the zone of interests test applies at all, the Appropriations Clause of the Constitution defines the zone of interests because it is the "particular provision of law upon which [Sierra Club] relies" in seeking relief. *Bennett*, 520 U.S. at 175–76. Section 8005 is relevant only because, to the extent it applies, it authorizes executive action that otherwise would be unconstitutional or *ultra vires*. That a statute is relevant does not transform a constitutional claim into a statutory one. Sierra Club's cause of action stems from the Federal Defendants' violation of the Appropriations Clause because it seeks to enforce the limits mandated by the clause.

To the extent the zone of interests test ever applies to constitutional causes of action, it asks only whether a plaintiff is "arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (quoting *Data Processing*, 397 U.S. at 153). This renders the test nearly superfluous: so long as a litigant is asserting an injury in fact to his or her constitutional rights, he has a cause of action. *See* ERWIN CHEMERINKSY, FEDERAL JURISDICTION 112 (7th ed. 2016) (citing LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 446 (3d ed. 2000)).

Applying that generous formulation of the test here, Sierra Club falls within the Appropriations Clause's zone of interests. Here, Sierra Club is an organization within the United States that is protected by the Constitution. The Appropriations Clause is a "bulwark of the Constitution's separation of powers," *U.S. Dep't. of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012), and the "separation of powers can serve to safeguard individual liberty," *McIntosh*, 833 F.3d at 1174 (quoting *Noel Canning*, 573 U.S. at 525). The unconstitutional transfer of funds here infringed upon Sierra Club's members' liberty interests, harming their environmental, aesthetic, and recreational interests. Thus, Sierra Club falls within the Clause's zone of interests, and Sierra Club has a cause of action to challenge the transfers.

## VI

Finally, we consider whether the district court abused its discretion in granting Sierra Club a permanent injunction enjoining the Federal Defendants from spending the funds at issue. We hold it did not, and we affirm the district court injunction.

A permanent injunction is appropriate when: (1) a plaintiff will suffer an irreparable injury absent injunction, (2) remedies available at law are inadequate,[15] (3) the balance of hardships between the parties supports an equitable remedy, and (4) the public interest would not be disserved. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party to the case, the court should consider the balance of hardships and public interests factors

---

[15] The parties do not contest this factor and so we do not address it.

together.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Although injunctive relief "does not follow from success on the merits as a matter of course," *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008), we review a district court's decision to grant a permanent injunction for abuse of discretion, *see eBay*, 547 U.S. at 391.

The district court did not abuse its discretion in weighing these factors and determining that injunctive relief was warranted.  First, we agree with the district court that Sierra Club would suffer irreparable harm to its recreational and aesthetic interests absent injunction.  An organization can demonstrate irreparable harm by showing that the challenged action will injure its members' enjoyment of public lands. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding irreparable harm when the Forest Service's proposed project would harm the Alliance's members' ability to "view, experience, and utilize" national forest areas in an undisturbed state).  We conclude that Sierra Club sufficiently demonstrated that the Federal Defendants' proposed use of funds would harm its members ability to recreate and enjoy public lands along the border such that it will suffer irreparable harm absent injunction.

The Federal Defendants' arguments to the contrary are unpersuasive.  The Federal Defendants submit that Sierra Club will not be irreparably harmed because its members have plenty of other space to enjoy.  We have already rejected the essence of the Federal Defendants' argument. *See All. for the Wild Rockies*, 632 F.3d at 1135 (concluding that the Forest Service's argument that plaintiffs can "view, experience, and utilize other areas of the forest" "proves too much," because its logical extension is that a "plaintiff can never suffer irreparable injury resulting from environmental

harm in a forest as long as there are other areas of the forest that are not harmed" (internal citations omitted)).

Moreover, we agree with the district court that the balance of equities and the public interest favor injunctive relief here. The public has an important interest in "ensuring that statutes enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quotations and citation omitted). By passing the CAA, Congress made a calculated choice to fund only one segment of border barrier. The public interest favors enforcing this decision. In contrast, the Federal Defendants cannot suffer harm "from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citing *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.")). We agree with the district court that the Federal Defendants' position essentially "boils down to an argument that the Court should not enjoin conduct found to be unlawful because the ends justify the means." No matter how great the collateral benefits of building a border wall may be, the transfer of funds for construction remains unlawful. The equitable maxim "he who comes in equity must come with clean hands" would be turned on its head if unlawful conduct by one party precluded a court from granting equitable relief to the opposing party. The district court properly concluded that the balance of equities and the public interest favor injunctive relief.

The Federal Defendants' additional arguments do not compel a different result. First, the Supreme Court's decision in *Winter* does not require us to vacate the injunction. In

*Winter*, the Supreme Court reversed a preliminary injunction enjoining the Navy from using a particular type of sonar that was essential to its training exercises because it violated NEPA and a number of federal environmental laws. 555 U.S. at 16–17. Key distinctions between this case and *Winter* render it inapposite. There, plaintiffs' "ultimate legal claim [was] that the Navy must prepare an [environmental impact statement], not that it must cease sonar training" because the use of the sonar had otherwise been sanctioned by law. *Id.* at 32. Having determined that the "continuation of the exercises . . . was 'essential to national security,'" *id.* at 18, the President had used his statutory authority to "exempt from compliance those elements of the Federal agency activity that [were] found by the Federal court to be inconsistent with an approved State program," 16 U.S.C. § 1456(c)(1)(B). In addition, the Council on Environmental Quality ("CEQ") had authorized the Navy to implement alternative arrangements to NEPA compliance that would allow the Navy to conduct its training exercises under mitigation procedures, but it imposed additional notice, research, and reporting requirements. *Winter*, 555 U.S. at 18–19.

By contrast, here, Sierra Club's ultimate legal claim is that DoD cannot legally use Section 8005 to fund construction of the border wall, and moreover, that no such exemption applies. If anything, Section 8005 itself is a defense against the Executive Branch's unconstitutional transfer of funds; however, as discussed previously, it offers no such legal cover here. Therefore, while the use of the sonar was not unlawful at the time the Supreme Court vacated the injunction in *Winter*, DoD's transfer of funds here is. While the injunction here "merely ends an unlawful practice," *Rodriguez*, 715 F.3d at 1145, the injunction in *Winter*

enjoined conduct that had been sanctioned by law, *see Winter*, 555 U.S. at 32.

Moreover, the public interest at issue in *Winter* more clearly favored vacating the injunction. "Antisubmarine warfare [was] [] the Pacific Fleet's top war-fighting priority." *Winter*, 555 U.S. at 12. Accordingly, the use of MFA sonar during training missions was deemed "mission-critical," *id.* at 14, because it is not only the "most effective technology," *id.* at 13, but "the only proven method of identifying submerged diesel-electric submarines operating on battery power," *id.* at 14. On the other side of the equation, "the most serious possible injury [to plaintiffs] would be harm to an unknown number of marine mammals." *Id.* at 26. The Court reasonably concluded that the "balance of equities and consideration of the overall public interest . . . tip strongly in favor of the Navy." *Id.*

The balance of interests does not so starkly favor the Federal Defendants here. Although they allege that the injunction "frustrates the government's ability to stop the flow of drugs across the border," unlike the government in *Winter*, the Federal Defendants have failed to demonstrate that construction of the border wall would serve this purpose, or alternatively, that an injunction would inhibit this purpose. The Federal Defendants cite drug trafficking statistics, but fail to address how the construction of additional physical barriers would further the interdiction of drugs. The Executive Branch's failure to show, in concrete terms, that the public interest favors a border wall is particularly significant given that Congress determined fencing to be a lower budgetary priority and the Department of Justice's own

data points to a contrary conclusion.[16] The district court properly accorded this interest little weight.[17] Therefore, we hold that the district court did not abuse its discretion, and we affirm the grant of the permanent injunction.

## VII

In sum, we affirm the district court. We conclude that Sierra Club and SBCC have Article III standing to file their

---

[16] According to the U.S. Department of Justice's Drug Enforcement Administration's 2018 National Drug Threat Assessment Report, the "most common method employed by [Mexican Transnational Criminal Organizations] involves transporting illicit drugs through U.S. [ports of entry] in passenger vehicles with concealed compartments or commingled with legitimate goods on tractor trailers." *2018 National Drug Threat Assessment*, U.S. Dep't of Just. Drug Enforcement Admin. at 99 (2018). Opioids like heroin and fentanyl are most commonly smuggled across the southwest border into the U.S. through legal ports of entry. *Id.* at 19–20, 33; *see also* Joe Ward & Anjali Singhvi, *Trump Claims There is a Crisis at the Border. What's the Reality?*, NEW YORK TIMES (Jan. 11, 2019) (analyzing U.S. Customs and Border Patrol data and finding that "[m]ost drugs are seized at ports of entry, not along the open border").

[17] We are likewise unconvinced by Defendants argument, citing *Maryland v. King*, 567 U.S. 1301 (2012), that "there is 'irreparable harm' whenever a government cannot enforce its own laws." The Ninth Circuit has recognized that there is "some authority" for the idea that "a state may suffer an abstract form of harm whenever one of its acts is enjoined," but, "to the extent that is true . . . it is not dispositive of the balance of harms analysis." *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (quoting *Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded on other grounds*, 132 S. Ct. 1204 (2012) (alterations adopted)); *see also id.* at 500 n.1 (noting that "[i]ndividual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined, [but] [n]o opinion for the Court adopts this view" (citations omitted)).

claims, that the Federal Defendants violated Section 8005 in transferring DoD appropriations to fund the El Paso, Yuma, El Centro, and Tucson Sectors of the proposed border wall, and that Sierra Club and SBCC have a constitutional cause of action under the Appropriations Clause and an *ultra vires* cause of action to challenge the Section 8005 transfers. We also decline to reverse the district court's decision to impose a permanent injunction. Given our resolution of this case founded upon the violations of Section 8005, we need not—and do not—reach the merits of any other theory asserted by Sierra Club, nor reach any other issues presented by the parties.

**AFFIRMED.**

COLLINS, Circuit Judge, dissenting:

This case involves similar claims to those presented in *California v. Trump*, Nos. 19-16299 & 19-16336, ___ F.3d ___ (9th Cir. 2020). In each case, a distinct group of plaintiffs brought suit challenging the Acting Secretary of Defense's invocation of § 8005 and § 9002 of the Department of Defense Appropriations Act, 2019 ("DoD Appropriations Act"), Pub. L. No. 115-245, Div. A, 132 Stat. 2981, 2999, 3042 (2018), to transfer $2.5 billion in funds that Congress had appropriated for other purposes into a different Department of Defense ("DoD") appropriation that could then be used by DoD for construction of border fencing and accompanying roads and lighting. In *California v. Trump*, the relevant plaintiffs are the States of California and New Mexico, who challenged two such construction projects, and here the plaintiffs are the Sierra Club and the Southern Border

Communities Coalition ("SBCC") (collectively, the "Organizations"), who challenge six projects. The district court granted declaratory relief to both sets of plaintiffs invalidating the transfers, but it granted permanent injunctive relief only to the Organizations. The majority concludes that the Organizations have Article III standing; that they have a cause of action to challenge the transfers under the Appropriations Clause of the Constitution as well as a cause of action under an equitable ultra vires theory; that the transfers were unlawful; and that the district court properly determined that the Organizations are entitled to declaratory and injunctive relief. I agree that at least the Sierra Club has established Article III standing, but in my view the Organizations lack any cause of action to challenge the transfers. And even assuming that they had a cause of action, I conclude that the transfers were lawful. Accordingly, I would reverse the district court's partial judgment for the Organizations and remand for entry of partial summary judgment in favor of the Defendants. I respectfully dissent.[1]

---

[1] There is considerable overlap between the substantive issues presented in this case and in *California v. Trump*, and my disagreements with the majority in this case largely parallel my disagreements in the other case. But rather than simply cross-reference all of the discussion in my dissent in *California v. Trump*, I will follow the majority and will rely on cross-reference only when it does. The result is a fair amount of verbatim repetition between this dissent and my dissent in *California v. Trump*, but proceeding in this way avoids the awkwardness of directing the reader to a separate published opinion when that reader wants to see what my response is to a particular point made by the majority in its opinion in this case.

**I**

The parties' dispute over DoD's funding transfers comes to us against the backdrop of a complex statutory framework and an equally complicated procedural history. Before turning to the merits, I will briefly review both that framework and that history.

**A**

Upon request from another federal department, the Secretary of Defense is authorized to "provide support for the counterdrug activities" of that department by undertaking the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(a), (b)(7). On February 25, 2019, the Department of Homeland Security ("DHS") made a formal request to DoD for such assistance. Noting that its counterdrug activities included the construction of border infrastructure, *see* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 102(a), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended as a note to 8 U.S.C. § 1103), DHS requested that "DoD, pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences[,] roads, and lighting" in several specified "Project Areas" in order "to block drug-smuggling corridors across the international boundary between the United States and Mexico."

On March 25, 2019, the Acting Defense Secretary invoked § 284 and approved the provision of support for DHS's "El Paso Sector Project 1" (which would involve DoD construction of border fencing, roads, and lighting in Luna

and Doña Ana Counties in New Mexico), as well as for, *inter alia*, DHS's "Yuma Sector Project 1" (which would involve DoD construction of similar border infrastructure in Yuma County, Arizona). Thereafter, the Secretary of Homeland Security invoked his authority under § 102(c) of IIRIRA to waive a variety of federal environmental statutes with respect to the planned construction of border infrastructure in the relevant portions of the El Paso Sector and the Yuma Sector, as well as "all . . . state . . . laws, regulations, and legal requirements of, deriving from, or related to the subject of," those federal laws. *See* 84 Fed. Reg. 17185, 17187 (Apr. 24, 2019); 84 Fed. Reg. 17187, 17188 (Apr. 24, 2019).

Subsequently, on May 9, 2019, the Acting Defense Secretary again invoked § 284, this time to approve DoD's construction of similar border infrastructure to support DHS's "El Centro Sector Project 1" in Imperial County, California, and DHS's "Tucson Sector Projects 1, 2, and 3" in Pima and Cochise Counties in Arizona. Less than a week later, the Secretary of Homeland Security again invoked his authority under IIRIRA § 102(c) to waive federal and state environmental laws, this time with respect to the construction in the relevant sections of the El Centro Sector and the Tucson Sector. *See* 84 Fed. Reg. 21800, 21801 (May 15, 2019); 84 Fed. Reg. 21798, 21799 (May 15, 2019).

Although § 284 authorized the Acting Defense Secretary to provide this support, there were insufficient funds in the relevant DoD appropriation to do so. Specifically, for Fiscal Year 2019, Congress had appropriated for "Drug Interdiction and Counter-Drug Activities, Defense" a total of only $670,271,000 that could be used for counter-drug support. *See* DoD Appropriations Act, Title VI, 132 Stat. at 2997 (appropriating, under Title governing "Other Department of

Defense Programs," a total of "$881,525,000, of which $517,171,000 shall be for counter-narcotics support"); *id*., Title IX, 132 Stat. at 3042 (appropriating $153,100,000 under the Title governing "Overseas Contingency Operations"). Accordingly, to support the El Paso Sector Project 1 and Yuma Sector Project 1, the Acting Secretary on March 25, 2019 invoked his authority to transfer appropriations under § 8005 of the DoD Appropriations Act and ordered the transfer of $1 billion from "excess Army military personnel funds" into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. That transfer was accomplished by moving $993,627,000 from the "Military Personnel, Army" appropriation and $6,373,000 from the "Reserve Personnel, Army" appropriation.

To support the El Centro Sector Project 1 and Tucson Sector Projects 1, 2, and 3, the Acting Secretary on May 9, 2019 again invoked his transfer authority to move an additional $1.5 billion into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Pursuant to § 8005 of the DoD Appropriations Act, DoD transferred a total of $818,465,000 from 12 different DoD appropriations into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Invoking the Secretary's distinct but comparable authority under § 9002 to transfer funds appropriated under the separate Title governing "Overseas Contingency Operations," DoD transferred $604,000,000 from the "Afghanistan Security Forces Fund" appropriation and $77,535,000 from the "Operation and Maintenance, Defense-Wide" appropriation into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation.

## B

The complex procedural context of this case involves two parallel lawsuits and four appeals to this court, and it has already produced one published Ninth Circuit opinion that was promptly displaced by the Supreme Court.

## 1

The Organizations filed this action in the district court against the Acting Defense Secretary, DoD, and a variety of other federal officers and agencies. In their March 18, 2019 First Amended Complaint, they sought to challenge, *inter alia*, any transfer of funds by the Acting Secretary under § 8005 or § 9002. California and New Mexico, joined by several other States, filed a similar action, and their March 13, 2019 First Amended Complaint also sought to challenge any such transfers. Both sets of plaintiffs moved for preliminary injunctions in early April 2019. The portion of the States' motion that was directed at the § 8005 transfers was asserted only on behalf of New Mexico and only with respect to the construction on New Mexico's border (*i.e.*, El Paso Sector Project 1). The Organizations' motion was likewise directed at El Paso Sector Project 1, but it also challenged Yuma Sector Projects 1 and one other project ("Yuma Sector Project 2").

After concluding that the Organizations were likely to prevail on their claims that the transfers under § 8005 were unlawful and that these organizational plaintiffs had demonstrated a "likelihood of irreparable harm to their members' aesthetic and recreational interests," the district court on May 24, 2019 granted a preliminary injunction enjoining Defendants from using transferred funds for "Yuma

Sector Project 1 and El Paso Sector Project 1."[2]    In a companion order, however, the district court denied preliminary injunctive relief to the States.  Although the court held that New Mexico was likely to succeed on its claim that the transfers under § 8005 were unlawful, the court concluded that, in light of the grant of a preliminary injunction against El Paso Sector Project 1 to the Organizations, New Mexico would not suffer irreparable harm from the denial of its duplicative request for such relief.   On May 29, 2019, Defendants appealed the preliminary injunction in favor of the Organizations, and after the district court refused to stay that injunction, Defendants moved in this court for an emergency stay on June 3, 2019.  New Mexico did not appeal the district court's denial of its duplicative request for a preliminary injunction.

**2**

While the Defendants' emergency stay request was being briefed and considered in this court, the Organizations moved for partial summary judgment on June 12, 2019.  The motion was limited to the issue of whether the transfers under § 8005 and § 9002 were lawful, and it requested corresponding declaratory relief, as well as a permanent injunction against the use of transferred funds for all six projects (El Paso Sector Project 1, El Centro Sector Project 1, Yuma Sector Project 1, and Tucson Sector Projects 1, 2, and 3).  California and New Mexico (but not the other States) filed a comparable summary judgment motion that same day, directed only at El Paso

---

[2] By the time the district court ruled, DoD had decided not to use funds transferred under § 8005 for any construction in Yuma Sector Project 2, and so the request for a preliminary injunction as to that project was moot.

Sector Project 1 and El Centro Sector Project 1.  Defendants filed cross-motions for summary judgment on the legality of the transfers under § 8005 and § 9002 with respect to the corresponding projects at issue in each case.

On June 28, 2019, the district court granted partial summary judgment and declaratory relief to both sets of plaintiffs, concluding that the transfers under § 8005 and § 9002 were unlawful.  The court granted permanent injunctive relief to the Organizations against all six projects, but it denied any such relief to California and New Mexico. The district court concluded that California and New Mexico had failed to prove a threat of future demonstrable environmental harm.  The court expressed doubts about the States' alternative theory that they had demonstrated injury to their sovereign interests, but the court ultimately concluded that it did not need to resolve that issue.  As before, the district court instead held that California and New Mexico would not suffer any irreparable harm in light of the duplicative relief granted to the Organizations.  The district court denied Defendants' cross-motions for summary judgment in both cases.  Invoking its authority under Federal Rule of Civil Procedure 54(b), the district court entered partial judgments in favor of, respectively, the Sierra Club and SBCC, and California and New Mexico.  The district court denied Defendants' request to stay the permanent injunction pending appeal.

**3**

On June 29, 2019, Defendants timely appealed in both cases and asked this court to stay the permanent injunction based on the same briefing and argument that had been presented in the preliminary injunction appeal.  California

and New Mexico timely cross-appealed nine days later. On July 3, 2019, this court consolidated Defendants' appeal of the judgment and permanent injunction with Defendants' pending appeal of the preliminary injunction.**[3]** That same day, a motions panel of this court issued a 2–1 published decision denying Defendants' motion for a stay of the permanent injunction (which had overtaken the preliminary injunction). *See Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019).

Defendants then applied to the Supreme Court for a stay of the permanent injunction pending appeal, which the Court granted on July 26, 2019. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). That stay remains in effect "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is timely sought." *Id.* at 1. In granting the stay, the Court concluded that "the Government has made a sufficient showing at this stage that [the Sierra Club and SBCC] have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.*

## II

Defendants have not contested the Article III standing of the Sierra Club and SBCC on appeal, but as the majority notes, "'the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.'" *See* Maj. Opin. at 17 n.9 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). As "an

---

**[3]** This court later consolidated the appeal and cross-appeal in the States' case with the already-consolidated appeals in this case.

indispensable part of the plaintiff's case, each element" of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife* (*Lujan v. Defenders*), 504 U.S. 555, 561 (1992). Thus, although well-pleaded allegations are enough at the motion-to-dismiss stage, they are insufficient to establish standing at the summary-judgment stage. *Id*. "In response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id*. (simplified).

In reviewing standing *sua sponte* in the context of cross-motions for summary judgment, it is appropriate to apply the more lenient standard that takes the *plaintiffs'* evidence as true and then asks whether a reasonable trier of fact could find Article III standing. *Lujan v. Defenders*, 504 U.S. at 563 (applying this standard in evaluating whether Government's cross-motion for summary judgment should have been granted). In their briefs below concerning the parties' cross-motions, the Sierra Club and SBCC each asserted that Defendants' allegedly unlawful conduct caused harm to their members' recreational, aesthetic, and environmental interests. Accepting the Organizations' evidence as true, and drawing all reasonable inferences in their favor, a reasonable trier of fact could conclude that at least the Sierra Club has associational standing under *Hunt v. Washington State Apple*

*Advert. Comm'n*, 432 U.S. 333 (1977).**[4]**  Under the *Hunt* test, an association has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id*. at 343.  The Sierra Club has presented sufficient evidence as to each of these three requirements.

To establish that its members would suffer irreparable harm absent a permanent injunction, the Sierra Club presented declarations from members who regularly visit the respective project areas.  These members described how the construction and the resulting border barriers would interfere with their enjoyment of the surrounding landscape and would impede their ability to fish, to hunt, to monitor and document wildlife and vegetation for educational purposes, and to participate in other activities near the project sites.  These injuries to the members' recreational, aesthetic, and environmental interests are sufficient to constitute an injury-in-fact for Article III purposes.  *See Lujan v. Defenders*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").  Moreover, these injuries are fairly traceable to the construction, and an injunction blocking the transfers would redress  those  injuries  by  effectively  stopping  that

---

**[4]** The district court explicitly addressed Article III standing only in connection with the preliminary injunction motion.  Although Article III standing was not revisited when the Organizations subsequently moved for summary judgment and a permanent injunction, the Organizations' showing of injury in support of a permanent injunction provides a sufficient basis for evaluating their Article III standing.

construction. *See id*. at 560–61. This evidence is therefore sufficient to establish that these members would have Article III standing to sue in their own right.

The other *Hunt* requirements are also satisfied. These members' interests are clearly germane to the Sierra Club's mission to protect the natural environment and local wildlife and plant life. And in seeking declaratory and injunctive relief, the lawsuit does not require the participation of individual members. *See Hunt*, 432 U.S. at 343.

Because the Sierra Club satisfies the applicable standing requirements as to all of the challenged projects, we may proceed to the merits without having to address SBCC's standing. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."). And given my view that the Organizations' legal challenges fail, I perceive no obstacle to entering judgment against *both* the Sierra Club and SBCC without determining whether the latter has standing. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 98 (1998).

### III

After examining the Article III standing of the Organizations, the majority then proceeds straight to the merits of whether the transfers were unlawful. *See* Maj. Opin. at 23. But we ought not address that issue unless we have first determined that the Organizations have asserted a viable cause of action that properly brings that issue before us. *See Air Courier Conf. v. American Postal Workers Union AFL-CIO*, 498 U.S. 517, 530–31 (1991). The majority

belatedly gets to that question in Section V of its opinion, holding that the Organizations have two viable causes of action: an equitable cause of action under the Constitution and an ultra vires cause of action. *See* Maj. Opin. at 25. I disagree with that conclusion, and I also disagree with the Organizations' alternative argument that they have a valid cause of action under the Administrative Procedure Act ("APA"). *See Trump v. Sierra Club*, 140 S. Ct. at 1 ("[T]he Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005.").[5]

---

[5] In its merits analysis, the majority scarcely cites the motions panel's published decision, which addressed the Organizations' likelihood of success on the merits of many of the same issues before us. I agree with the majority's implicit rejection of the Organizations' contention that the motions panel's opinion bars this merits panel from examining these issues afresh. Although the motions panel decision is a precedent, it remains subject to reconsideration by this court until we issue our mandate. *See United States v. Houser*, 804 F.2d 565, 567–68 (9th Cir. 1986) (distinguishing, on this point, between reconsideration of a prior panel's decision "during the course of a single appeal" and a decision "on a prior appeal"); *cf. Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (three-judge panel lacks authority to overrule a decision in a prior appeal in the same case). To the extent that *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015), suggests otherwise, that suggestion is dicta and directly contrary to our decision in *Houser*. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261–65 (9th Cir. 2020). In all events, the precedential force of the motions panel's opinion was largely, if not entirely, vitiated by the Supreme Court's subsequent decision to grant the very stay that the motions panel's opinion denied. I do not agree, however, with the majority's disregard of the Supreme Court's order in this case—a disregard that hardly befits the "wary and humble" attitude the majority professes. *See* Maj. Opin. at 25–26.

## A

Although the Organizations invoke the APA only as a fallback to their preferred non-statutory claims, I think it is appropriate to first consider whether they have a *statutory* cause of action under the APA. *Cf. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) (suggesting that, if a plaintiff relies on both the APA and non-statutory-review claims, the APA claim should be considered first). Even assuming *arguendo* that the APA does not displace reliance upon alternative non-statutory causes of action, *see infra* at 69, the contours of any express cause of action under the APA certainly provide appropriate context for the consideration of any non-statutory claim.

In authorizing suit by any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the APA incorporates the familiar zone-of-interests test, which reflects a background principle of law that always "applies unless it is expressly negated," *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).[6]  That test requires a plaintiff to "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. NWF*, 497 U.S. at

---

[6] The Supreme Court has not squarely addressed whether the zone-of-interests test applies to a plaintiff who claims to have "suffer[ed] legal wrong because of agency action," which is the other class of persons authorized to sue under the APA, 5 U.S.C. § 702. *See Lujan v. National Wildlife Fed.* (*Lujan v. NWF*), 497 U.S. 871, 882–83 (1990). The Organizations have not invoked any such theory here, so I have no occasion to address it.

883 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396–97 (1987)).   This test "is not meant to be especially demanding." *Clarke*, 479 U.S. at 399.  Because the APA was intended to confer "generous review" of agency action, the zone-of-interests test is more flexibly applied under that statute than elsewhere, and it requires only a showing that the plaintiff is "*arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp* (*Data Processing*), 397 U.S. 150, 153, 156 (1970) (emphasis added); *see also Bennett*, 520 U.S. at 163 ("what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes") (simplified).  Because an APA plaintiff need only show that its interests are "arguably" within the relevant zone of interests, "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Although these standards are generous, the Organizations have failed to satisfy them.

**1**

In applying the zone-of-interests test, we must first identify the "statutory provision whose violation forms the legal basis for [the] complaint" or the "gravamen of the complaint." *Lujan v. NWF*, 497 U.S. at 883, 886; *see also Air Courier Conf.*, 498 U.S. at 529.  That question is easy here. The Organizations' complaint alleges that the challenged transfers are not authorized by § 8005 and § 9002 because "[t]he diversion of funding to build a border wall or fence is not based on unforeseen military requirements"; "the building of a permanent border wall is not a 'military requirement'";

and "Congress has denied funding for Defendants' planned wall construction, thus barring the Department of Defense from using transfers to fund it."[7] The Organizations allege that, because Congress thus "has not authorized the Department of Defense to transfer additional Defense funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of supporting another agency, rather than for military requirements," the Appropriations Clause bars the transfers and "Defendants are acting ultra vires in seeking to transfer funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of building a permanent border wall." Given that the case turns on whether the transfers met the criteria in § 8005, that statute is plainly the "gravamen of the complaint," and it therefore defines the applicable zone of interests. *Lujan v. NWF*, 497 U.S. at 886.

Although the Organizations invoke the Appropriations Clause and the constitutional separation of powers in contending that Defendants' actions are unlawful, any such constitutional violations here can be said to have occurred *only if* the transfers violated the limitations set forth in § 8005: if Congress authorized DoD to transfer the appropriated funds from one account to another, and to spend them accordingly, then the money has been spent "in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7, and the Executive has not otherwise

---

[7] Because the limitations on transfers set forth in § 8005 also apply to transfers under § 9002, *see* 132 Stat. at 3042, the parties use "§ 8005" to refer to both provisions, and I will generally do so as well.

transgressed the separation of powers.[8]    *All* of the Organizations' theories for challenging the transfers—whether styled as constitutional claims or as statutory claims—thus rise or fall based on whether DoD has transgressed the limitations on transfers set forth in § 8005. As a result, § 8005 is obviously the "statute whose violation is the gravamen of the complaint." *Lujan v. NWF*, 497 U.S. at 886.  To maintain a claim under the APA, therefore, the Organizations must establish that they are within the zone of interests of § 8005.[9]

---

[8] The only possible exception is the Organizations' argument that § 8005 *itself* violates the Presentment Clause.  As explained below, that contention is frivolous. *See infra* at 71–72.

[9] The Organizations briefly contend that DoD has exceeded its authority under § 284 and has violated the National Environmental Policy Act ("NEPA"), but even assuming *arguendo* that the Organizations have a cause of action to raise any such challenges, they are patently without merit.  The Organizations note that § 284 contains a special reporting requirement for "small scale construction" projects, which are defined as projects costing $750,000 or less, 10 U.S.C. § 284(h)(1)(B), (i)(3), and they argue that this shows that Congress did not authorize projects on the scale at issue here.  The inference is a non sequitur: the fact that Congress requires special reporting of these smaller projects does not mean that they are the *only* projects authorized.  Congress may have imposed such a unique reporting requirement in order to capture the sort of smaller-scale activities that might otherwise have escaped its notice.  And the fact that past expenditures under § 284 have happened to be for more modest projects is irrelevant, because nothing in the text of § 284 imposes any such size limits on the projects authorized by that statute.    The Organizations' reliance on NEPA is likewise meritless.  We have upheld DHS's waiver of NEPA under § 102(c) of IIRIRA, *see In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1225 (9th Cir. 2019), and the district court correctly concluded that the waiver applies to construction that DoD undertakes under § 284 to "provide support" to DHS at DHS's "request[]," 10 U.S.C. § 284. *See Sierra Club v. Trump*, 379 F. Supp. 3d 883, 922–23 (N.D. Cal. 2019).

**2**

Having identified the relevant statute, our next task is to "discern the interests arguably to be protected by the statutory provision at issue" and then to "inquire whether the plaintiff's interests affected by the agency action in question are among them." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.* (*NCUA*), 522 U.S. 479, 492 (1998) (simplified). Identifying the interests protected by § 8005 is not difficult, and here the Organizations' asserted interests are not among them.

Section 8005 is a grant of general transfer authority that allows the Secretary of Defense, if he determines "that such action is necessary in the national interest" and if the Office of Management and Budget approves, to transfer from one DoD "appropriation" into another up to $4 billion of the funds that have been appropriated under the DoD Appropriations Act "for military functions (except military construction)." *See* 132 Stat. at 2999. Section 8005 contains five provisos that further regulate this transfer authority, and the only limitations on the Secretary's authority that the Organizations claim were violated here are all contained in the first such proviso. That proviso states that "such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." *Id.*[10] The remaining provisos require prompt notice to Congress "of all transfers made pursuant to this

---

[10] Similar language has been codified into permanent law. *See* 10 U.S.C. § 2214(b). No party contends that § 2214(b) alters the relevant analysis under the comparably worded provision in § 8005.

authority or any other authority in this Act"; proscribe the use of funds to make requests to the Committees on Appropriations for reprogrammings that are inconsistent with the restrictions described in the first proviso; set a time limit for making requests for multiple reprogrammings; and exempt "transfers among military personnel appropriations" from counting towards the $4 billion limit. *Id*.

Focusing on "the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175–76, makes clear that § 8005 as a whole, and its first proviso in particular, are aimed at tightening congressional control over the appropriations process.    The first proviso's general prohibition on transferring funds for any item that "has been denied by the Congress" is, on its face, a prohibition on using the transfer authority to effectively reverse Congress's specific decision to deny funds to DoD for that item. 132 Stat. at 2999. The second major limitation imposed by the first proviso states that the transfer authority is not to be used unless, considering the items "for which [the funds were] originally appropriated," there are "higher priority items" for which the funds should now be used in light of "military requirements" that were "unforeseen" in DoD's request for Fiscal Year 2019 appropriations. *Id*. The obvious focus of this restriction is likewise to protect congressional judgments about appropriations by (1) restricting DoD's ability to *reprioritize* the use of funds differently from how Congress decided to do so and (2) precluding DoD from transferring funds appropriated by Congress for "military functions" for purposes that do not reflect "military requirements."    The remaining provisos, including the congressional reporting requirement, all similarly aim to maintain congressional control over appropriations. And all of the operative restrictions in § 8005 that the Organizations

invoke here are focused *solely* on limiting DoD's ability to use the transfer authority to reverse the congressional judgments reflected in *DoD's* appropriations.

In addition to preserving congressional control over DoD's appropriations, § 8005 also aims to give DoD some measure of flexibility to make necessary changes. Notably, in authorizing the Secretary to make transfers among appropriations, § 8005's first proviso specifies only *one* criterion that he must consider in exercising that discretion: he must determine whether the item for which the funds will be used is a "*higher priority* item[]" in light of "unforeseen *military* requirements." 132 Stat. at 2999 (emphasis added). Under the statute, he need not consider any other factor concerning either the original use for which the funds were appropriated or the new use to which they will now be put.

In light of these features of § 8005, the "interests" that the Organizations claim are "affected by the agency action in question" are not "among" the "interests arguably to be protected" by § 8005. *NCUA*, 522 U.S. at 492 (simplified). In particular, the Organizations' asserted recreational, aesthetic, and environmental interests clearly lie outside the zone of interests protected by § 8005. The statute does not mention recreational, aesthetic, and environmental interests, nor does it require the Secretary to consider such interests. On the contrary, the statute requires him only to consider whether an item is a "higher priority" in light of "military requirements," and it is otherwise entirely neutral as to the uses to which the funds will be put. Indeed, that neutrality is reflected on the face of the statute, which says that, once the transfer is made, the funds are "merged with and . . . available *for the same purposes*, and for the same time period, *as the appropriation or fund to which transferred*." 132 Stat.

at 2999 (emphasis added). Because the alleged recreational, aesthetic, and environmental harms that the Organizations assert here play no role in the analysis that § 8005 requires the Secretary to conduct, and are not among the harms that § 8005's limitations seek to address or protect, the Organizations' interests in avoiding these harms are not within § 8005's zone of interests.

Moreover, focusing on the specific interests for which the Organizations have presented sufficient evidentiary support at the summary-judgment stage, *see Lujan v. NWF*, 497 U.S. at 884–85, further confirms that, in deciding whether to redirect excess military personnel funds under § 8005 to assist DHS by building fencing to stop international drug smuggling, the Acting Secretary of Defense did not have to give even the slightest consideration to whether that reprogramming of funds would disrupt views of the desert landscape or affect local flora and fauna. Put simply, the Organizations' recreational, aesthetic, and environmental interests are "'so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

**3**

The Organizations nonetheless claim that they fall within § 8005's zone of interests because § 8005 was "aimed at tightening congressional control over executive spending," and the Organizations' interests do not "meaningfully diverge from Congress's interests in enacting the statute." This contention fails. As the Supreme Court made clear in *Lujan v. NWF*, the zone-of-interests test requires the plaintiff to make a factual showing that the plaintiff itself, or someone

else whose interests the plaintiff may properly assert, has a cognizable interest that falls within the relevant statute's zone of interests. 497 U.S. at 885–99 (addressing whether the interests of NWF—or of any of its members, whose interests NWF could validly assert under *Hunt*'s associational standing doctrine—had been shown to be within the relevant zone of interests). I am aware of no precedent that would support the view that these Organizations can *represent* the interests of Congress (akin to NWF's representation of the interests of its members), much less that they can do so merely because they are sympathetic to Congress's perceived policy objectives.[11] But the Organizations do not actually rely on such a novel theory. Instead, the Organizations suggest that, merely because their overall litigation objectives here do not diverge from those of Congress, they have thereby satisfied the zone-of-interests test with respect to their *own* interests. This theory is clearly wrong.

The critical flaw in the Organizations' analysis is that it rests, not on the *interests* they are asserting (preservation of landscape, flora, fauna, etc.), but on the *legal theory* that the Organizations invoke to protect those interests here. But the zone-of-interests test focuses on the former and not the latter. *See Lujan v. NWF*, 497 U.S. at 885–89. Indeed, if the Organizations were correct, that would effectively eliminate

---

[11] Even if the Organizations could assert Congress's interests in some representational capacity, they could do so only if the injury to Congress's interests satisfied the requirements of Article III standing. *See Air Courier Conf.*, 498 U.S. at 523–24 (zone-of-interests test is applied to those injuries-in-fact that meet Article III requirements). I express no view on that question. *Cf. U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019) (holding that House lacks Article III standing to challenge the transfers at issue here), *appeal ordered heard en banc*, 2020 WL 1228477 (D.C. Cir. 2020).

the zone-of-interests test.  By definition, *anyone* who alleges a violation of a particular statute has thereby invoked a legal theory that does not "meaningfully diverge" from the interests of those *other* persons or entities who *are* within that statute's zone-of-interests.  Such a tautological congruence between the Organizations' legal theory and Congress's institutional interests is not sufficient to satisfy the zone-of-interests test here.

The Organizations suggest that their approach is supported by the D.C. Circuit's decision in *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356 (D.C. Cir. 1996), but that is wrong.  As the opinion in that case makes clear, the D.C. Circuit was relying on the same traditional zone-of-interests test, under which a plaintiff's interests are "outside the statute's 'zone of interests' only 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  87 F.3d at 1360 (quoting *Clarke*, 479 U.S. at 399).  The court mentioned "congruence" in the course of explaining why the plaintiff's interests in that case were "not more likely to frustrate than to further statutory objectives," *i.e.*, why those interests were not *inconsistent* with the purposes implicit in the statute.  *Id.* (simplified).  It did not thereby suggest—and could not properly have suggested—that the mere lack of any such inconsistency is alone sufficient under the zone-of-interests test.  Here, the problem is not that the Organizations' interests are inconsistent with the purposes of § 8005, but rather that they are too "marginally related" to those purposes.  *See supra* at 66.

The Organizations also suggest that we must apply the zone-of-interests test broadly here, because—given Congress's inability to enforce the limitations of § 8005 directly—the agency's transfers would otherwise be effectively "unreviewable." The assumption that no one will ever be able to sue for any violation of § 8005 seems doubtful, *cf. Sierra Club v. Trump*, 929 F.3d at 715 (N.R. Smith, J., dissenting) (suggesting that "those who would have been entitled to the funds as originally appropriated" may be within the zone of interests of § 8005), but in any event, we are not entitled to bend the otherwise applicable—and already lenient—standards to ensure that someone will be able to sue in this case or others like it.

## B

As noted earlier, the Organizations only invoke the APA as a fallback option, and they instead insist that they may assert claims under the Constitution, as well as an equitable cause of action to enjoin "ultra vires" conduct. The Organizations do not have a cause of action under either of these theories.

## 1

The Organizations contend that they are not required to satisfy any zone-of-interests test to the extent that they assert non-APA causes of action to enjoin Executive officials from taking *unconstitutional* action.[12] Even assuming that an

---

[12] It is not entirely clear that the Organizations are alternatively contending that *APA claims* to enjoin *unconstitutional* conduct, *see* 5 U.S.C. § 706(2)(B), are exempt from the zone-of-interests test. To the extent that they are so contending, the point seems doubtful. *See Data*

equitable cause of action to enjoin unconstitutional conduct exists alongside the APA's cause of action, *see Juliana v. United States*, 947 F.3d 1159, 1167–68 (9th Cir. 2020); *Navajo Nation v. Department of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017); *but see Sierra Club v. Trump*, 929 F.3d at 715–17 (N.R. Smith, J., dissenting), it avails the Organizations nothing here. The Organizations have failed to allege the sort of constitutional claim that might give rise to such an equitable action, because their "constitutional" claim is effectively the very same § 8005-based claim dressed up in constitutional garb. And even if this claim counted as a "constitutional" one, it would still be governed by the same zone of interests defined by the relevant limitations in § 8005.

**a**

The Organizations assert three constitutional claims in their operative complaint: (1) that Defendants have violated the constitutional separation of powers by "usurp[ing] Congress's legislative authority"; (2) that Defendants have violated the Presentment Clause by "modify[ing] or repeal[ing] Congress's appropriations legislation by executive proclamation, rather than by law"; and (3) that Defendants have violated the Appropriations Clause by "allocat[ing] money from the Department of the Treasury by executive proclamation, rather than by law, and in contravention of restrictions contained in Congress's appropriations' laws."

---

*Processing*, 397 U.S. at 153 (zone-of-interests test requires APA claimant to show that its interest "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"). But in all events, any such APA-based claim to enjoin unconstitutional conduct would fail for the same reasons as the Organizations' purported free-standing equitable claim to enjoin such conduct.

As clarified in their subsequent briefing, the Organizations assert both what I will call a "strong" form of these constitutional arguments and a more "limited" form. In its strong form, the Organizations' argument is that, *even if § 8005 authorized the transfers in question here*, those transfers nonetheless violated the Presentment Clause. In its more limited form, the Organizations' argument is that the transfers violated the separation of powers, the Presentment Clause, and the Appropriations Clause *because* the transfers were not authorized by § 8005.

I need not address whether the Organizations have an equitable cause of action to assert the strong form of their constitutional argument, because in my view that argument on the merits is so "wholly insubstantial and frivolous" that it would not even give rise to federal jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co.*, 523 U.S. at 89. If § 8005 *allowed* the transfers here, then that necessarily means that the Executive has properly spent funds that Congress, by statute, has *appropriated* and allowed to be spent for *that* purpose. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion"). By transferring funds after finding that the statutory conditions for doing so are met, an agency thereby "execut[es] the policy that Congress had embodied in the statute" and does not unilaterally alter or repeal any law in violation of the Presentment Clause or the separation of powers. *See Clinton v. City of New York*, 524 U.S. 417, 444 (1998). If anything, it is the Organizations' theory—that the federal courts must give effect to an alleged broader congressional judgment against border funding *regardless* of whether that judgment

is embodied in binding statutory language—that would offend separation-of-powers principles.

That leaves only the more limited form of the Organizations' argument, which is that, *if* § 8005 did not authorize the transfers, *then* the expenditures violated the Appropriations Clause, the Presentment Clause, and the separation of powers. Under *Dalton v. Specter*, 511 U.S. 462 (1994), this theory—despite its constitutional garb—is properly classified as "a statutory one," *id*. at 474. It therefore does not fall within the scope of the asserted non-APA equitable cause of action to enjoin *unconstitutional* conduct.[13]

In *Dalton*, the Court addressed a non-APA claim to enjoin Executive officials from implementing an allegedly unconstitutional Presidential decision to close certain military bases under the Defense Base Closure and Realignment Act of 1990. 511 U.S. at 471.[14] But the claim in *Dalton* was not that the President had directly transgressed an applicable constitutional limitation; rather, the claim was that, *because* Executive officials "violated the procedural requirements" of the statute on which the President's decision ultimately rested, the President thereby "act[ed] in excess of his statutory authority" and therefore "violate[d] the

---

[13] There remains the Organizations' claim that *statutory* violations may be enjoined under a non-APA ultra vires cause of action for equitable relief, but that also fails for the reasons discussed below. *See infra* at 79–80.

[14] The plaintiffs in *Dalton* also asserted a claim under the APA itself, but that claim failed for the separate reason that the challenged final action was taken by the President personally, and the President is not an "agency" for purposes of the APA. *See* 511 U.S. at 469.

constitutional separation-of-powers doctrine." *Id*. at 471–72. The Supreme Court rejected this effort to "eviscerat[e]" the well-established "distinction between claims that an official exceeded his *statutory* authority, on the one hand, and claims that he acted in violation of the *Constitution*, on the other." *Id*. at 474 (emphasis added). As the Court explained, its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. The Court distinguished *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), on the ground that there "the Government disclaimed any statutory authority for the President's seizure of steel mills," and as a result the Constitution itself supplied the rule of decision for determining the legality of the President's actions. *Dalton*, 511 U.S. at 473. Because the "only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces," *Youngstown* thus "necessarily turned on *whether the Constitution authorized* the President's actions." *Id*. (emphasis added). By contrast, given that the claim in *Dalton* was that the President had violated the Constitution *because* Executive officials had "violated the terms of the 1990 Act," the terms of that statute provided the applicable rule of decision and the claim was therefore "a statutory one." *Id*. at 474. And because those claims sought to enjoin conduct on the grounds that it violated *statutory* requirements, it was subject to the "longstanding" limitation that non-APA "review is not available when the statute in question commits the decision to the discretion of the President." *Id*.

Under *Dalton*, the Organizations' purported "constitutional" claims—at least in their more limited

version—are properly classified as *statutory* claims that do *not* fall within any non-APA cause of action to enjoin unconstitutional conduct.  511 U.S. at 474.  Here, as in *Dalton*, Defendants have "claimed" the "statutory authority" of § 8005, and any asserted violation of the Constitution would occur *only if, and only because,* Defendants' conduct is assertedly not authorized by § 8005.  *Id*. at 473.  The rule of decision for *this* dispute is thus not supplied, as in *Youngstown*, by the Constitution; rather, it is supplied only by § 8005.  *Id*. at 473–74.  Because these claims by the Organizations are thus "statutory" under *Dalton*, they may only proceed, if at all, under an equitable cause of action to enjoin ultra vires conduct, and they would be subject to any limitations applicable to such claims.  *Id*. at 474.  The Organizations do assert such a fallback claim here, but it fails for the reasons I explain below.  *See infra* at 79–80.

### b

But even if the Organizations' claims may properly be classified as *constitutional* ones for purposes of the particular equitable cause of action they invoke here, those claims would still fail.

To the extent that the Organizations argue that the Constitution *itself* grants a cause of action allowing *any plaintiff with an Article III injury* to sue to enjoin an alleged violation of the Appropriations Clause, the Presentment Clause, or the separation of powers, there is no support for such a theory.  None of the cases cited by the Organizations involved putative plaintiffs, such as the Organizations here, who are near the outer perimeter of Article III standing.  On the contrary, these cases involved either allegedly unconstitutional agency actions *directly targeting* the

claimants, *see Bond v. United States*, 564 U.S. 211, 225–26 (2011) (criminal defendant challenged statute under which she was convicted on federalism and separation-of-powers grounds); *United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016) (criminal defendants sought to enjoin, based on an appropriations rider and the Appropriations Clause, the Justice Department's expenditure of funds to prosecute them), or they involved a suit based on an express *statutory* cause of action, *see Clinton v. City of New York*, 524 U.S. at 428 (noting that right of action was expressly conferred by 2 U.S.C. § 692(a)(1) (1996 ed.)).

Moreover, the majority's novel contention that the Constitution *requires* recognizing, in this context, an equitable cause of action that extends to the outer limits of Article III cannot be squared with the Supreme Court's decision in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). There, the Court rejected the view that the Supremacy Clause itself created a private right of action for equitable relief against preempted statutes, and instead held that any such equitable claim rested on "judge-made" remedies that are subject to "express and implied statutory limitations." *Id.* at 325–27. The Supremacy Clause provides a particularly apt analogy here, because (like the Appropriations Clause) the asserted "unconstitutionality" of the challenged action generally depends upon whether it falls *within or outside the terms of a federal statute*: a state statute is "unconstitutional under the Supremacy Clause" only if it is "contrary to federal law," *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1361–62 (9th Cir. 1998), and here, the transfers violated the Appropriations Clause only if they were barred by the limitations in § 8005. And just as the Supremacy Clause protects Congress's "broad discretion with regard to the

enactment of laws," *Armstrong*, 575 U.S. at 325–26, so too the Appropriations Clause protects "congressional control over funds in the Treasury," *McIntosh*, 833 F.3d at 1175. It is "unlikely that the Constitution gave Congress such broad discretion" to enact appropriations laws only to simultaneously "*require[]* Congress to permit the enforcement of its laws" by *any* "private actor[]" with even minimal Article III standing, thereby "*limit[ing]* Congress's power" to decide how "to enforce" the spending limitations it enacts. *Armstrong*, 575 U.S. at 325–26.[15]

The Appropriations Clause thus does not itself create a constitutionally required cause of action that extends to the limits of Article III. On the contrary, any equitable cause of action to enforce that clause would rest on a "judge-made" remedy: as *Armstrong* observed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. At least where, as here, the contours of the applicable constitutional line (under the

---

[15] The majority asserts that *Armstrong* is distinguishable on the grounds that the Appropriations Clause is supposedly more protective of individual liberty than the Supremacy Clause. *See* Maj. Opin. at 30–31. Nothing is cited to support this comparative assertion, which seems highly doubtful: there is no reason to think that Congress's ability, in the exercise of its enumerated powers, to preempt potentially oppressive state laws is any *less* protective of individual liberty than is Congress's ability to insert riders in appropriations bills. Moreover, to the extent that these clauses protect individual liberty, they both do so only as a consequence of protecting congressional authority within our overall constitutional structure. *Armstrong*'s core point—that it would be "strange indeed" to construe a clause that protects congressional power as simultaneously saddling Congress with a particular enforcement method—remains equally applicable to both. 575 U.S. at 326.

Appropriations Clause) are defined by and parallel a statutory line (under § 8005), any such judge-made equitable cause of action would be subject to "express and implied statutory limitations," as well as traditional limitations governing such equitable claims. *Id*.

One long-established "'judicially self-imposed limit[] on the exercise of federal jurisdiction'"—including federal equitable jurisdiction—is the requirement "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). This limitation is *not* confined to the APA, but rather reflects a "prudential standing requirement[] of general application" that always "applies unless it is expressly negated" by Congress. *Id*. at 163.[16] Because Congress has not expressly negated that test in any relevant respect, the Organizations' equitable cause of action to enforce the Appropriations Clause here remains subject to the zone-of-interests test. *Cf. Thompson v. North American Stainless, LP*,

---

[16] The majority wrongly contends that, by quoting this language from *Bennett*, and stating that the zone-of-interests test therefore "applies to all *statutorily* created causes of action," *Lexmark*, 572 U.S. at 129 (emphasis added), the Court in *Lexmark* thereby intended to signal that the test *only* applies to statutory claims and not to non-statutory equitable claims. *See* Maj. Opin. at 36–37. Nothing in *Lexmark* actually suggests any such negative pregnant; instead, the Court's reference to "statutorily created causes of action" reflects nothing more than the fact that only statutory claims were before the Court in that case. *See* 572 U.S. at 129. Moreover, *Lexmark* notes that the zone-of-interests test's roots lie in the common law, *id*. at 130 n.5, and *Bennett* (upon which *Lexmark* relied) states that the test reflects a "prudential standing requirement[] of general application" that applies to any "exercise of federal jurisdiction," 520 U.S. at 162–63.

562 U.S. 170, 176–77 (2011) (construing a cause of action as extending to "any person injured in the Article III sense" would often produce "absurd consequences" and is for that reason rarely done). And given the unique nature of an Appropriations Clause claim, as just discussed, *the line between constitutional and unconstitutional conduct* here is defined entirely by the limitations in § 8005, and therefore the relevant zone of interests for the Organizations' Appropriations-Clause-based equitable claim remains defined by *those* limitations. Thus, contrary to the majority's conclusion, *see* Maj. Opin. at 39–40, the Organizations are outside the applicable zone of interests for this claim as well.

In arguing for a contrary view, the Organizations rely heavily on *United States v. McIntosh*, asserting that there we granted non-APA injunctive relief based on the Appropriations Clause without inquiring whether the claimants were within the zone of interests of the underlying appropriations statute. *McIntosh* cannot bear the considerable weight that the Organizations place on it.

In *McIntosh*, we asserted interlocutory jurisdiction over the district courts' refusal to enjoin the expenditure of funds to prosecute the defendants—an expenditure that allegedly violated an appropriations rider barring the Justice Department from spending funds to prevent certain States from "'implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.'" 833 F.3d at 1175; *see also id*. at 1172–73. We held that the defendants had Article III standing and that, if the Department was in fact "spending money in violation" of that rider in prosecuting the defendants, that would produce a violation of the Appropriations Clause that could be raised by the defendants in challenging their prosecutions. *Id*.

at 1175. After construing the meaning of the rider, we then remanded the matter for a determination whether the rider was being violated. *Id*. at 1179. Contrary to the Organizations' dog-that-didn't-bark theory, nothing can be gleaned from the fact that the zone-of-interests test was never discussed in *McIntosh*. *See Cooper Indus., Inc. v. Aviall Servs, Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Moreover, any such silence seems more likely to have been due to the fact that it was so overwhelmingly obvious that the defendants *were* within the rider's zone of interests that the point was incontestable and uncontested. An asserted interest in not going to prison for *complying* with state medical-marijuana laws seems well within the zone of interests of a statute prohibiting interference with the implementation of such state laws.

**2**

The only remaining question is whether the Organizations may evade the APA's zone-of-interests test by asserting a non-APA claim for ultra vires conduct in excess of *statutory* authority. Even assuming that such a cause of action exists alongside the APA, *cf. Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 189–90 (D.C. Cir. 2006), I conclude that it would be subject to the same zone-of-interests limitations as the Organizations' APA claims and therefore likewise fails.

For the same reasons discussed above, any such equitable cause of action rests on a judge-made remedy that is subject to the zone-of-interests test. *See supra* at 74–79. The

Organizations identify no case from the Supreme Court or this court affirmatively holding that the zone-of-interests test does *not* apply to a non-APA equitable cause of action to enjoin conduct allegedly in excess of express statutory limitations on *statutory* authority, and I am aware of none. Indeed, it makes little sense, when evaluating a claim that Executive officials exceeded the *limitations* in a federal statute, not to ask whether the plaintiff is within the zone of interests protected by those statutory limitations. *Cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (although plaintiff asserting ultra vires claim may not need to show that its interests "fall within the zones of interests of the constitutional and statutory *powers* invoked" by Executive officials, when "a particular constitutional or statutory provision was intended to protect persons like the litigant by *limiting* the authority conferred," then "the litigant's interest may be said to fall within the zone protected by the *limitation*") (emphasis added).[17]  Here, those limitations are supplied by § 8005, and the Organizations are not within the zone of interests of that statute.[18]

---

[17] The majority thus relies on the wrong portion of Judge Bork's opinion in *Haitian Refugee Center*. *See* Maj. Opin. at 37–39. This case turns on a "statutory provision" that "limit[s] the authority conferred." 809 F.2d at 811 n.14. If the Executive had contended that it had power to transfer the funds regardless of § 8005, then this case would look more like *Youngstown*, but no such extravagant claim has been pressed in this case. On the contrary, Defendants concede that, if the requirements of § 8005 were not met, then the transfers were unlawful.

[18] Even if the Organizations were correct that the zone-of-interests test does not apply to a non-APA equitable cause of action, that would not necessarily mean that such equitable jurisdiction extends, as the Organizations suggest, to the outer limits of Article III. Declining to apply the APA's generous zone-of-interests test might arguably render applicable the sort of narrower review of agency action that preceded the

\*    \*    \*

Given that each of the Organizations' asserted theories fail, the Organizations lack any cause of action to challenge the DoD's transfer of funds under § 8005.

## IV

Alternatively, even if the Organizations had a cause of action, their claims would fail on the merits, because the challenged transfers did not violate § 8005 or § 9002.  In the companion appeal, *California v. Trump*, the majority concluded that § 8005 and § 9002 did not authorize the transfers at issue, and I concluded that these provisions did authorize the transfers.  Just as the majority "reaffirm[s] this holding here and conclude[s] that Section 8005 did not authorize the transfer of funds," Maj. Opin. at 24, I reaffirm my previous conclusion that § 8005 and § 9002 authorized the transfers.

## V

Based on the foregoing, I conclude that at least the Sierra Club has Article III standing, but that the Organizations lack any cause of action to challenge these § 8005 and § 9002 transfers.  Alternatively, if the Organizations did have a cause of action, their claims fail on the merits as a matter of law because the transfers complied with the limitations in § 8005 and § 9002.  I therefore would reverse the district court's partial grant of summary judgment to the Organizations and would remand the matter with instructions to grant

APA standards articulated in *Data Processing*, 397 U.S. at 153.  *See also Clarke*, 479 U.S. at 400 n.16.

Defendants' motion for summary judgment on this set of claims. Because the majority concludes otherwise, I respectfully dissent.